## AFFIDAVIT IN SUPPORT OF
## AN APPLICATION FOR A SEARCH WARRANT

I, Caolan Ruadhan Scott, being first duly sworn, hereby depose and state as follows:

### *Introduction and Agent Background*

1.     I am a Special Agent with the Federal Bureau of Investigation ("FBI"). I am currently assigned to the FBI's Rhode Island Safe Streets Gang Task Force (hereinafter, the "Task Force") and investigate violent street gangs and drug/firearms trafficking organizations operating in and around the State of Rhode Island. As such, I am a law enforcement officer of the United States within the meaning of Federal Rule of Criminal Procedure 41(a)(2)(C), that is, a government agent engaged in enforcing the criminal laws and duly authorized by the Attorney General to request a search warrant.

2.     This affidavit is made in support of an Application for a Search Warrant pursuant to Rule 41 of the Federal Rules of Criminal Procedure for a search of two electronic devices, specifically, two Apple iPhones (SUBJECT DEVICES)  which are currently in the possession of law enforcement, further described in Attachments A-1 and A-2, and the extraction from that property of electronically stored information described in B-1 and B-2.

3.     I have received training in the field of narcotics and firearms enforcement and investigations.  I am familiar with the habits, methods, routines, practices and procedures commonly employed by persons engaged in the trafficking of illegal firearms and drugs.  I have been the affiant on dozens of affidavits in support of search

warrants, arrest warrants, GPS location warrants and other applications.  Through my training, education and experience, I have become familiar with the manner in which illegal narcotics and firearms are transported, stored, and distributed, and with the methods of payment for such items.

4.     Additionally, based on my training and experience and my participation in other controlled substance investigations, I know that it is common for drug dealers to "front" (provide on consignment) controlled substances to their customers; conceal contraband, the proceeds of drug sales, and store drugs/firearms and cash in remote locations sometimes referred to as "stash houses;" maintain records of drug and gun transactions; and use cellular telephones to facilitate their illegal distribution operations. I also know that drug/weapons trafficking is an illicit business and an ongoing process requiring the development, use and protection of a communication network to facilitate daily drug distribution.  Drug dealers use various methods to thwart law enforcement detection, including frequently changing cellular phones and vehicles, using various aliases, and using coded communications.  Based on my experience in drug and firearm investigations, I know that traffickers frequently refer to illicit drugs and guns in guarded conversations and frequently use code words when referring to controlled substances or money.

5.     Based upon my training and experience and my participation in this investigation, I know that:

a.  Drug traffickers often place assets, including apartments, houses, vehicles, and telephones, in names other than their own to avoid detection of these assets by government agencies. Although these assets are held in other names, the drug dealers actually own or use these assets and exercise dominion and control over them. Records relating to these assets are frequently found in their residences and other locations controlled by them.

b.  Persons involved in drug trafficking conceal in their vehicles, residences, and businesses; controlled substances, large amounts of currency, financial instruments, precious metals, jewelry, and other items of value, and/or proceeds of drug transactions, and evidence of financial transactions relating to obtaining, transferring secreting, or spending money made from engaging in narcotic trafficking activities. Money, tangible property and records relating to these assets are frequently found in their residences and other locations controlled by them.

c.  Drug traffickers often carry, on their person or maintained in secure locations, weapons to protect themselves and their controlled substances from theft by other users, traffickers, or criminals, and from seizure by law enforcement agencies. Drug traffickers store these weapons in their residences, vehicles, and/or businesses and stash houses, or other locations controlled by them.

3

d.  Drug traffickers commonly maintain addresses or telephone numbers in books, papers, computers, cellular telephones and other electronic data storage devices, and other information that reveals the names, addresses, and/or telephone numbers for their associates in the drug trafficking organization, even if that information may be in code. Records and electronic devices of this sort are also frequently found on the persons of drug traffickers or in their residences, motor vehicles, and other locations controlled by them.

e.  Drug traffickers frequently take, or cause to be taken, photographs and/or videos of themselves, their associates, or their property. Records in the form of photographs and/or videos are often found in the residences, offices, or other places under the control of drug traffickers, and provide valuable evidence of conspiratorial relationships. Records of this type are sometimes in hard copy are but increasingly found stored on computers, cellular telephones, thumb drives, and other items possessing the capability of storing electronic data.

f.  Drug traffickers often keep equipment and materials for packaging, cutting, weighing, manufacturing, and distributing controlled substances in their homes, stash houses or other locations controlled by them. That drug paraphernalia often includes, but is not limited to, scales, plastic wrap, plastic bags, surgical gloves, presses, and cutting agents as well as

4

aromatic substances such as soap, dryer sheets, wood shavings, and heat sealers all of which are used to mask the odor of illegal drugs in an attempt to avoid detection by drug detection dogs. Large-scale drug traffickers sometimes use money counting machines to help count and sort the proceeds of drug trafficking.

g.  Drug traffickers commonly consign controlled substances to their clients and couriers. They frequently maintain books, records, receipts, notes, ledgers, airline tickets, money orders, and other papers relating to the transportation, ordering, sale, and distribution of controlled substances. Records of this type are kept in locations where traffickers have ready access to them, including on their person or in their residences, stash houses, vehicles, businesses, smart telephones, tablets, personal computers and other electronic data storage devices. Drug traffickers also maintain these items and records for long periods of time regardless of whether their value to the drug dealer has diminished. Oftentimes, this type of evidence is generated, maintained, and then forgotten about. Thus, documents that one would think a prudent person would destroy because of their incriminatory nature are still possessed months or even years after the documents came into the possession of the drug dealer. Oftentimes, these individuals do not even realize the incriminatory nature of the documents they keep. Documentary evidence dating back years is

5

sometimes found in residences and other locations controlled by

traffickers.

h.  Persons who reside in or who are using a particular residence will often

have documents, bills, and correspondence which list their names and

addresses in that residence. Documents such as personal telephone books,

address books, utility company receipts, keys, personal letters, rent

receipts, mortgage documents, clothing and other articles of personal

property would tend to establish residency at a particular location and

provide valuable evidence concerning ownership and control over areas

in which drugs or other incriminating evidence are found. Records and

documents of this type may also be found in hard copy or stored

electronically on computers, mobile telephones, and other media that

store data electronically.

6.  I have learned that the United States Postal Service ("USPS") and other

overnight and rapid delivery services are used to facilitate the distribution of

contraband, including controlled substances. During my law enforcement career, I have

participated in numerous investigations, including those involving the execution of

searches for controlled substances and controlled deliveries of drugs to criminal

offenders. I have observed controlled substances and the paraphernalia used to

package, distribute, and ingest these substances.

6

7.      Based on my training and experience, I know that narcotic trafficking typically involves the local, interstate, and international movement of illegal drugs to distributors and coconspirators at multiple levels, and the movement of the proceeds of narcotics trafficking among multiple participants including suppliers, customers, distributors, and money launderers. I know from my training and experience and from drug trafficking intelligence information gathered by the United States Postal Inspection Service (USPIS) that U.S. Postal Service Express Mail and Priority Mail are frequently utilized by drug traffickers for shipping drugs and drug proceeds.

8.      Use of Express Mail and Priority Mail are favored because of the speed, reliability, free telephone and internet package tracking service, as well as the perceived minimal chance of detection. Express Mail was originally intended for urgent, business-to-business, correspondence. However, based on USPIS intelligence and the investigation into numerous prior packages that were found to contain contraband, these types of packages containing contraband are usually sent from an individual to an individual.

9.      I have learned that in efforts to combat the flow of controlled substances through the U. S. mails, interdiction programs have been established in cities throughout the United States by the USPIS. These cities have been identified as known sources of controlled substances. The USPIS conducted an analysis of prior packages which were found to contain drugs and drug proceeds. The analysis of prior packages that were found to contain drugs or drug proceeds indicated that these packages are

7

usually from an individual to an individual. In the few cases when Express

Mail/Priority Mail packages containing drugs or drug proceeds have displayed a

business or company name, it has usually proven to be a fictitious business or company.

Additionally, this analysis has established a series of package characteristics which,

when a package is found with a combination of two or more characteristics described

below, have shown high probability that the package will contain a controlled

substance or the proceed of controlled substance sales. These characteristics include the

following: (1) package is mailed from or addressed to a narcotic source city; (2) package

has a fictitious return/sender address or name; (3) package has address information

which is handwritten; (4) the handwritten label on the Priority/Express Mail article

does not contain a business account number, thereby indicating that the sender paid

cash; (5) package is addressed from an individual to an individual and (6) package is

heavily taped.

10.     This affidavit is intended to show only that there is sufficient probable

cause for the requested warrant and does not set forth all of my knowledge about this

matter.

### Background, Sources, Methods and Means

11.     This affidavit is based on my own investigation, and on information

reliably provided to me by Departments represented on the Task Force, as well as by

other federal, state, and local law enforcement officers in Rhode Island. I have relied on

information supplied by Agents, Troopers, Detectives and Officers from the FBI, Rhode

Island State Police, Providence Police Department, Cranston Police Department, Pawtucket Police Department, Woonsocket Police Department, Central Falls Police Department, and the Rhode Island Department of Corrections. I have also relied on reports of investigations that I have prepared or that were prepared by other law enforcement Agents; business records, and public and/ or law enforcement databases. I have also relied on information provided to the Task Force by a Confidential Informant who I will only refer to as "CI-1." In order to protect CI-1's identity, I will refer to CI-1 with a masculine pronoun regardless of CI-1's gender.

### *Confidential Informant #1*

12.    CI-1 has been providing information to the government since approximately 2014.  He is not available to testify. CI-1 has a criminal history which includes felony convictions for distribution of narcotics and conspiracy. CI-1 is motivated by financial means and will be paid for his cooperation with this investigation, although he has not been paid as of today's date. Since the start of his cooperation, he has provided the Task Force with information that I or other law enforcement agents have independently corroborated through toll records, recorded conversations, video recordings, physical surveillance, and other law enforcement confidential sources.  He has proven to be a credible and reliable informant, and provided information in the past that has led to the arrest of at least one individual for violations of the Rhode Island Uniformed Controlled Substance Act. I have never found him to have provided false information.

*Controlled Delivery*

13.      Throughout the course of this investigation, Agents conducted numerous undercover deliveries of suspected packages of narcotics to 1417 Chalkstone Ave. Providence, RI, which are generally referred to as "Controlled Deliveries".  In each instance, when a suspected package of narcotics was identified by the USPIS as being destined for 1417 Chalkstone Ave. Providence, RI, the USPIS took control of the package from the time it was identified until it was due for delivery/ pickup. On the day of the delivery/pickup, the Task Force established surveillance on 1417 Chalkstone Ave. Providence, RI or the Postal Facility prior to the package being delivered. Thereafter, an undercover USPIS Inspector delivered the package either at the front door of 1417 Chalkstone Ave. Providence, RI or directly to HENRY ARNAUT. Thereafter, the Task Force maintained surveillance of the package until it was either retrieved from the front door of 1417 Chalkstone Ave. Providence, RI, or until ARNAUT returned to 1417 Chalkstone Ave. Providence, RI with the package. When I used the term "Controlled Delivery" in this affidavit, this is the technique I am generally referring to.

*Probable Cause*

14.      Since the summer of 2020, the USPIS and the Task Force have been conducting a narcotics investigation into a drug trafficking organization ("DTO") suspected of shipping narcotics from California into New England. During the course of this investigation, Postal Inspectors determined the DTO uses multiple different

10

addresses to facilitate the delivery of narcotics shipments from California to New

England. In November of 2020, the USPIS identified 1417 Chalkstone Ave. Providence,

RI to likely be one of these addresses.

15.     I have observed the  residence at 1417 Chalkstone Ave., Providence, RI.  It

appears to be a multi-family structure.  Viewing the house from the street, it is a house

bearing numbers 1419 and 1417. There are two front doors to the property which are

accessed by a front porch.  The door on the right has the number 1417 affixed to the

right of it and the door on the left has the number 1419 affixed to the left of it.    I

received a subpoena response from National Grid on November 23, 2020 regarding

1417 Chalkstone Ave. Providence, RI, which indicated ROSARIO to be listed utility

subscriber for "1417 Chalkstone Avenue, apartment 2, Providence, RI." I also obtained

information from the Providence Tax Assessors Office regarding 1417 Chalkstone Ave.

Providence, RI, which revealed ROSARIO as the listed owner of "1417 Chalkstone

Avenue, providence, RI," indicating that ROSARIO is in fact the owner of the entire

property. Specifically, the Tax Assessor's office lists 1417 Chalkstone Ave. Providence,

RI as having a first floor, finished upper story, open porch, and a basement unit.

16.     November 17th, 2020 CONTROLLED DELIVERY: On November 17, 2020,

the Task Force coordinated with the USPIS to conduct a controlled delivery of a

suspected package of narcotics to 1417 Chalkstone Ave. Providence, RI. The package

destined for 1417 Chalkstone Ave. Providence, RI was sent via USPS Priority Mail

Express, and bore the following markings: From: MARGARITAS, FLOWERS, 1690

Story Road, Suite # 128, San Jose, CA, 95122; Telephone Number: (408) 612-2233; To:

HENRY ARNAUT, 1417 Chalkstone Avenue, providence, RI, 02909; Date accepted:

11/12/2020; Scheduled delivery date: 11/13/2020; Package weight: 3 lbs., 15 oz;

Tracking Number: EJ495806617US.

17.     At approximately 11:00 am, members of the Task Force initiated

surveillance on 1417 Chalkstone Ave. Providence, RI. Upon doing so, I observed a black

Honda CRV, bearing Rhode Island registration 1AA130 ("the black CRV") as it was

parked in the driveway of 1419 Chalkstone Avenue. This residence is connected to 1417

Chalkstone Ave. Providence, RI, and shares the same common area to the rear of the

residence. Records checks revealed the back CRV to be registered to MINERVA

ROSARIO at 1417 Chalkstone Ave. Providence, RI. Agents believe ROSARIO to be

ARNAUT's mother. Surveillance units also observed a white Jeep Grand Cherokee,

bearing Rhode Island registration VC841 ("the white Jeep") as it was parked in the rear

parking area of 1417 Chalkstone Ave. Providence, RI.

18.     At approximately 11:37 am, I was advised by the USPIS that the controlled

delivery would take place shortly. Moments later, I observed a USPIS Postal Inspector

as he arrived at 1417 Chalkstone Ave. Providence, RI and delivered the package on the

front porch. Upon completion of the controlled delivery, the USPIS advised me that a

note was taped to the front door of 1417 Chalkstone Ave. Providence, RI instructing

delivery personnel to deliver all packages to the rear of the residence. The USPIS

12

confirmed that despite the notice, the package was delivered at the front door of the residence.

19.     At approximately 12:00 pm, surveillance units observed a Hispanic male fitting the description of HENRY ARNAUT, date of birth: 7/05/1995, wearing a white t-shirt and grey sweatpants, as he walked up the driveway from the rear of 1417 Chalkstone Ave. Providence, RI and retrieved the package from the front door. I previously reviewed a Rhode Island Division of Motor Vehicles (DMV) driver's license photograph depicting an image of ARNAUT, and am therefore familiar with ARNAUT's appearance. However, due to obstructions in my view and that of other surveillance units, the Task Force was not able to make a positive identification of ARNAUT. After retrieving the package, I observed the person believed to be ARNAUT as he carried the package down the driveway towards the rear of 1417 Chalkstone Ave. Providence, RI.

20.     At approximately 12:32 pm, surveillance units observed the person believed to be ARNAUT as he departed 1417 Chalkstone Ave. Providence, RI on foot, and was not observed to be carrying anything.

21.     The Task Force maintained surveillance on 1417 Chalkstone Ave. Providence, RI for several hours after the Controlled Delivery took place, and observed numerous individuals going in and out of 1417 Chalkstone Ave. Providence, RI and its surrounding area. However, surveillance units did not observe anyone else in possession of the package.

22.     At approximately 2:45 pm, agents identified ARNAUT smoking a cigarette on the second-floor balcony of 1417 Chalkstone Ave. Providence, RI.

23.     The package had characteristics which have shown a high probability that it would contain a controlled substance or proceeds of such.  I know that San Jose is a drug source city.  The investigation revealed that MARGARITAS FLOWERS is not located at the 1690 Story Road, Suite address, but that it is a strip mall type of location with a cell phone store at that address.  The addressee and sender information were handwritten, the package was heavily taped and there was no business account associated with the package, indicating that the sender paid cash.

24.     November 24th, 2020 CONTROLLED DELIVERY: On November 24, 2020, the Task Force coordinated with the USPIS to conduct a controlled delivery of another package of suspected narcotics to 1417 Chalkstone Ave. Providence, RI. The package destined for this address was sent via USPS Priority Mail Express, and bore the following markings: From: ENRIQUE MENDES, 1005 E Mission Street, San Jose, CA, 95112; To: HENRY ARNAUT, 1417 Chalkstone Avenue, Providence, RI, 02909; Date accepted: 11/23/2020; Scheduled delivery date: 11/24/2020; Package weight: 3 lbs., 9 oz; Tracking Number: EJ495808604US.

25.     At approximately 11:00 am, the Task Force initiated surveillance on 1417 Chalkstone Ave. Providence, RI. Upon doing so, I observed the white Jeep parked in in the vicinity of the residence.

14

26.     At approximately 11:48 am, the USPIS advised me that the controlled delivery would take place shortly. Moments later, Agents observed a USPIS Postal inspector as he arrived at 1417 Chalkstone Ave. Providence, RI and delivered the package on the front porch. Upon completion of the controlled delivery, the USPIS notified me that the same note was taped to the front door of 1417 Chalkstone Ave. Providence, RI instructing delivery personnel to deliver all packages to the rear of the residence. The USPIS Postal inspector confirmed that despite the notice, the package was delivered at the front door of the residence.

27.     At approximately 12:19 pm, Agents observed a Hispanic male fitting the description of ARNAUT, wearing a grey t-shirt and grey sweatpants, as he walked up the driveway from the rear of 1417 Chalkstone Ave. Providence, RI and retrieved the package from the front door. Due to obstructions blocking the view of surveillance units, a positive identification of ARNAUT was not able to be made. However, Agents observed the person believed to be ARNAUT to be talking on the phone while taking the package back to the rear of 1417 Chalkstone Ave. Providence, RI.

28.     The Task Force maintained surveillance on 1417 Chalkstone Ave. Providence, RI for several hours after the Controlled Delivery took place, and observed numerous individuals going in and out of 1417 Chalkstone Ave. Providence, RI, and its surrounding area. However, surveillance units did not observe anyone else in possession of the package.

29.    This package had characteristics which have shown a high probability that it would contain a controlled substance or proceeds of such.  Law Enforcement databases found no connection with the sender ENRIQUE MENDES with the 1005 E Mission Street, San Jose, CA, 95112 address.  Furthermore, the addressee and sender information were handwritten, the package was heavily taped and there was no business account associated with the package, indicating that the sender paid cash.

30.    On or about December 1, 2020, Task Force officer Mario Cerullo and I debriefed CI-1 regarding targets of this investigation, specifically, ARNAUT and 1417 Chalkstone Ave. Providence, RI. CI-1 informed me that he was recently inside 1417 Chalkstone Ave. Providence, RI, and described 1417 Chalkstone Ave. Providence, RI to me in detail. Specifically, CI-1 described 1417 Chalkstone Ave. Providence, RI as being located at 1417 Chalkstone Avenue, Providence, RI, and stated that 1417 Chalkstone Ave. Providence, RI it is a two-family style dwelling, white in color with a front porch on the first floor and a front porch on the second floor. The second-floor porch is only accessible from the second-floor apartment. The first-floor porch has two wooden doors.  According to CI-1, the left door leads to the first-floor apartment, and the right door leads into a common hallway which has stairway access to the second-floor apartment, Located on the right side of the property is a driveway which provides access to the rear of the property and Marconi Street.  The rear of 1417 Chalkstone Ave. Providence, RI has two access doors, one on the left side and one on the right side.  The right door has steps that lead up to it.

16

31.     CI-1 confirmed the owner of 1417 Chalkstone Ave. Providence, RI to be

MINERVA ROSARIO, and explained that ARNAUT is ROSARIO's son. CI-1 knows

ARNAUT to reside in the basement apartment of 1417 Chalkstone Ave. Providence, RI,

which is accessed by the left door when looking at the rear of 1417 Chalkstone Ave.

Providence, RI. CI-1 explained that ARNAUT resides in this apartment with a light-

skinned Hispanic male who operators the white Jeep.  CI-1 advised me that ARNAUT

frequently accesses ROSARIO's apartment, which is located on the second floor of 1417

Chalkstone Ave. Providence, RI, and which is accessed by the right-side door when

viewing the front of 1417 Chalkstone Ave. Providence, RI. CI-1 is aware that ARNAUT

keeps personal effects in the both the basement area, and second floor apartment area,

of 1417 Chalkstone Ave. Providence, RI.

32.     December 31st, 2020 CONTROLLED DELIVERY: On December 29th, 2020,

the USPIS informed me that another package was destined for delivery at 1417

Chalkstone Ave. Providence, RI. The package bore the following markings: From: YESI

MENDEZ, 1031 E Mission Street, San Jose, CA, 95112; To: HENRY ARNAUT, 1417

Chalkstone Avenue, Providence, RI, 02909; Date accepted: 12/28/2020; Scheduled

delivery date: 12/29/2020; Package weight: 6 lbs., 11 oz; Tracking Number:

EJ452267668US.

33.     Later that day, at the direction of the Task Force, a USPIS Postal inspector

left a "re-delivery" slip on the front door of 1417 Chalkstone Ave. Providence, RI

instructing the recipient at 1417 Chalkstone Ave. Providence, RI to call the post office in order to schedule a delivery or pickup time for the package.

34.     On December 30, 2020, the USPIS received a telephone call from (401) 602-9429 ("the 9429 number") inquiring about the re-delivery slip left on the front door of 1417 Chalkstone Ave. Providence, RI. The caller-id at the USPIS indicated that the phone call was from ARNAUT. During the call, ARNAUT agreed to pick up the package at the United States Post Office, located at 24 Corliss Street, Providence, RI between 10:00 a.m. and 12:00 p.m. the following day.

35.     On December 31, 2020, at approximately 9:30 am, the Task Force initiated surveillance on 24 Corliss Street and 1417 Chalkstone Ave. Providence, RI. At approximately 12:22 p.m., surveillance units at 1417 Chalkstone Ave. Providence, RI observed a person matching the description of ARNAUT as he walked from the rear of 1417 Chalkstone Ave. Providence, RI to the driveway of 1419 Chalkstone Avenue. Specifically, ARNAUT was observed to be dressed in a black hooded sweatshirt and dark grey/black sweatpants. Moments later, surveillance units observed ARNAUT as he walked back towards the front door of 1417 Chalkstone Ave. Providence, RI while appearing to talk on the phone. ARNAUT then walked back towards the driveway of 1419 Chalkstone Avenue, and walked out of view of surveillance units.

36.     At approximately 12:30 p.m., due to the fact ARNAUT missed the scheduled pickup window, surveillance was terminated at 24 Corliss Street and at 1417 Chalkstone Ave. Providence, RI.

37.     At approximately 12:45 p.m., USPIS Postal inspector Rich Atwood informed me that ARNAUT had arrived at 24 Corliss Street and attempted to pick up the package. Postal inspector Atwood is familiar with ARNAUT's appearance from having previously reviewed a Rhode Island DMV driver's license photograph depicting an image of ARNAUT, and was therefore able to make a positive identification. Postal inspector Atwood informed me that ARNAUT was wearing a black hooded sweatshirt and dark grey/black sweatpants. The Task Force immediately re-initiated surveillance at 24 Corliss Street. Upon doing so, I observed the black CRV parked in the parking lot of 24 Corliss Street. I did not observe any other passengers inside the vehicle. Postal inspector Atwood informed ARNAUT that he would need to wait while the package was brought to the counter.

38.     Moments later, I observed ARNAUT as he exited the front door of the post office, entered the driver's seat of the black CRV, and waited several minutes.

39.     At approximately 12:59 p.m., I observed ARNAUT as he exited the driver's seat of black Honda CRV and walked to the main entrance of the post office. Moments later, Postal Inspector Atwood informed me that ARNAUT was at the counter, and provided his Rhode Island driver's license and the re-delivery slip which was left by the USPIS on the front door of 1417 Chalkstone Ave. Providence, RI. Postal Inspector Atwood photographed ARNAUT's driver's license along with the re-delivery slip. Upon verification of ARNAUT's identity, Postal inspector Atwood relinquished the package to ARANUT.

19

40.     At approximately 1:02 p.m., I observed ARNAUT as he exited the Post Office with the package in his left arm, and entered the driver's seat of black Honda CRV. Members of the Task Force surveilled ARNAUT as he departed the parking lot of the Post Office. ARNAUT was followed directly back to the vicinity of 1417 Chalkstone Ave. Providence, RI where he arrived at approximately 1:18 p.m. Specifically, I observed ARNAUT as he parked the black CRV in the driveway of 1419 Chalkstone Avenue, and walked to the rear of 1417 Chalkstone Ave. Providence, RI carrying the package. Thereafter, surveillance was terminated.

41.     On January 4, 2020, I received a subpoena return from Verizon Wireless pertaining to the 9429 number, which revealed ARNAUT as the subscriber of the 9429 number, with a listed subscriber address as 1417 Chalkstone Ave. Providence, RI.

42.     This package also had characteristics which have shown a high probability that it would contain a controlled substance or proceeds of such.  Law Enforcement databases found no connection with the sender YESI MENDES with the 1031 E Mission Street, San Jose, CA, 95112 address.  Furthermore, the addressee and sender information were handwritten, the package was heavily taped and there was no business account associated with the package, indicating that the sender paid cash.

43.     The January 6th, 2021 Trash Pull: On January 6, 2021, members of the Task Force conducted a trash pull at 1417 Chalkstone Ave. Providence, RI. The trash barrels were located on the public sidewalk in front of the residence. After retrieving the trash from these barrels, I located a white trash bag containing nine clear plastic baggies

20

and/or pieces of clear plastic baggies, which were co-located with two blue rubber gloves and a take-out food receipt bearing the name "HENRY", dated 1/1/2021. One of the clear plastic baggies contained a white powder residue, consistent in color, texture, and odor with that of powder and/or crack cocaine. I conducted a field test of the trace residue from the bag, which tested positive for the presence of cocaine.

44.     I also located a brown paper bag containing approximately 105 clear plastic baggies and/or pieces of baggies, which was co-located with two empty USPS packages addressed to JOSE TORRES, 1419 Chalkstone Avenue, Providence, RI. Two of these clear plastic baggies contained a white powder residue, consistent in color, texture, and odor with that of powder and/or crack cocaine. I conducted a field test of the trace residue from both baggies, which tested positive for the presence of cocaine.

45.     Lastly, I located several pieces of mail addressed to 1417 Chalkstone Ave. Providence, RI. One piece was addressed to ARNAUT, and another piece was addressed to ROSARIO.

46.     I compared the handwriting of all four packages addressed to ARNAUT referenced in this affidavit. Based on this comparison, and on my training and experience, I believe the handwriting on all four packages to be similar. I also noticed that despite having different return addresses and different sender names, all packages were sent from the San Jose, CA area. In fact, the packages delivered on November 24th and December 31st, and the package scheduled for delivery on February 4th were sent from senders located five houses away from each other on East Mission Street in San

21

Jose.  Based on my training and experience, I know that it is common for drug traffickers to utilize different names and return addresses for drug shipments, despite being geographically located in proximity to one another, in order to evade detection by law enforcement.  Furthermore, 1417 Chalkstone Ave. Providence, RI also listed a sender and return address the same as the parcel referenced in paragraph 28, bearing USPS Priority Mail Express Parcel bearing Tracking Number: EJ452267668US.  That sender, YESI MENDES was not found to have a connection with the sender address.

47.     The February 4th Search Warrant: On February 3, 2021, the USPIS informed me that another package was destined to be delivered to ARNAUT at 1417 Chalkstone Ave. Providence, RI. The package bore the following markings: From: YESI MENDEZ, 1031 E Mission Street, San Jose, CA, 95112; To: HENRY ARNAUT, 1417 Chalkstone Avenue, Providence, RI, 02909; Date accepted: February 2, 2021; Scheduled delivery date: 2/03/2021; Package weight: 2 lbs. 2.9 oz; Tracking number: EJ612767649US.

48.     On February 4, 2021, at my direction, the USPIS seized the package pending the application of a search warrant. Meanwhile, at approximately 9:00 a.m., the USPIS left a re-delivery slip on the front door of 1417 Chalkstone Ave. Providence, RI, instructing the recipient at 1417 Chalkstone Ave. Providence, RI to call a specified phone number in order to arrange delivery/pickup of the package.

49.     At approximately 4:30 p.m., the Honorable Magistrate Judge Lincoln D. Almond, District of Rhode Island, authorized a search warrant for this package (reference 21-SW-027-LDA).

50.     At approximately 4:35 p.m., USPIS Postal Inspector Atwood and I executed the search warrant at the United States Postal Inspectors Office, Providence, RI. Located within the package was a clear plastic vacuum sealed bag, wrapped in clear plastic cellophane and tape. The vacuum sealed bag contained a hard, white substance consistent in color, texture, and odor with that of powder cocaine. USPIS Postal Inspector Atwood conducted a field analysis of the suspected powder cocaine with a Tru-Narc analyzer, which indicated a positive test result for the presence of cocaine. The suspected cocaine and packaging had a total gross weight of approximately .54 kilograms.

51.     On February 5, 2021, a female contacted the post office inquiring about the delivery of the package bearing the tracking number EJ612767649US.  She was told that the package was addressed to ARNAUT.  On Monday, February 8, 2021, a male identifying himself as ARNAUT contacted the post office and was told that the package would be available for delivery after 10 am.

52.     On February 8, 2021, approximately 9:30 a.m., members of the SSTF were informed that ARNAUT had arrived at the United States Post Office located at 24 Corliss Street, Providence, RI.  SSTF members observed the black CRV in the post office parking lot.  ARNAUT produced his identification, a RI driver's license, to pick up

23

package EJ612767649US.   ARNAUT was then arrested as he left the post office with the package.  Two cellular devices, both SUBJECT DEVICES were taken from ARNAUT.

53.      I applied for and was authorized to search the defendant's residence at 1417 Chalkstone Avenue (21-SW-30PAS).  Upon searching, law enforcement discovered scales and packaging consistent with narcotics packaging.  Over 50 pills which appear consistent with pills typically containing fentanyl and packaged consistent with being sold (which have yet to be tested), 4 magazines for pistols, 102 rounds of 9-millimeter ammunition, and 5 high capacity rifle magazines.

*Training and Experience on Drug Trafficking and Electronic Devices*

54.      Based on my training and experience, I use the following technical terms to convey the following meanings:

      a.  Wireless telephone:  A wireless telephone (or mobile telephone, or cellular telephone) is a handheld wireless device used for voice and data communication through radio signals.  These telephones send signals through networks of transmitter/receivers, enabling communication with other wireless telephones or traditional "land line" telephones.  A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone.  In addition to enabling voice communications, wireless telephones offer a broad range of capabilities.  These capabilities include: storing names and phone

numbers in electronic "address books;" sending, receiving, and
storing text messages and e-mail; taking, sending, receiving, and
storing still photographs and moving video; storing and playing
back audio files; storing dates, appointments, and other
information on personal calendars; and accessing and downloading
information from the Internet.  Wireless telephones may also
include global positioning system ("GPS") technology for
determining the location of the device.

b.  Digital camera:  A digital camera is a camera that records pictures
as digital picture files, rather than by using photographic film.
Digital cameras use a variety of fixed and removable storage media
to store their recorded images.  Images can usually be retrieved by
connecting the camera to a computer or by connecting the
removable storage medium to a separate reader.  Removable
storage media include various types of flash memory cards or
miniature hard drives.  Most digital cameras also include a screen
for viewing the stored images.  This storage media can contain any
digital data, including data unrelated to photographs or videos.

c.  Portable media player:  A portable media player (or "MP3 Player"
or iPod) is a handheld digital storage device designed primarily to
store and play audio, video, or photographic files.  However, a

25

portable media player can also store other digital data. Some portable media players can use removable storage media. Removable storage media include various types of flash memory cards or miniature hard drives. This removable storage media can also store any digital data. Depending on the model, a portable media player may have the ability to store very large amounts of electronic data and may offer additional features such as a calendar, contact list, clock, or games.

d. GPS: A GPS navigation device uses the Global Positioning System to display its current location. It often contains records the locations where it has been. Some GPS navigation devices can give a user driving or walking directions to another location. These devices can contain records of the addresses or locations involved in such navigation. The Global Positioning System (generally abbreviated "GPS") consists of 24 NAVSTAR satellites orbiting the Earth. Each satellite contains an extremely accurate clock. Each satellite repeatedly transmits by radio a mathematical representation of the current time, combined with a special sequence of numbers. These signals are sent by radio, using specifications that are publicly available. A GPS antenna on Earth can receive those signals. When a GPS antenna receives signals

26

from at least four satellites, a computer connected to that antenna

can mathematically calculate the antenna's latitude, longitude, and

sometimes altitude with a high level of precision.

e.  PDA:  A personal digital assistant, or PDA, is a handheld electronic

device used for storing data (such as names, addresses,

appointments, or notes) and utilizing computer programs.  Some

PDAs also function as wireless communication devices and are

used to access the Internet and send and receive e-mail.  PDAs

usually include a memory card or other removable storage media

for storing data and a keyboard and/or touch screen for entering

data.  Removable storage media include various types of flash

memory cards or miniature hard drives.  This removable storage

media can store any digital data.  Most PDAs run computer

software, giving them many of the same capabilities as personal

computers.  For example, PDA users can work with word-

processing documents, spreadsheets, and presentations.  PDAs

may also include global positioning system ("GPS") technology for

determining the location of the device.

f.  IP Address: An Internet Protocol address (or simply "IP address")

is a unique numeric address used by computers on the Internet.

An IP address is a series of four numbers, each in the range 0-255,

27

separated by periods (e.g., 121.56.97.178).  Every computer attached

to the Internet computer must be assigned an IP address so that

Internet traffic sent from and directed to that computer may be

directed properly from its source to its destination.  Most Internet

service providers control a range of IP addresses.  Some computers

have static—that is, long-term—IP addresses, while other

computers have dynamic—that is, frequently changed—IP

addresses.

g.   Internet: The Internet is a global network of computers and other

electronic devices that communicate with each other.  Due to the

structure of the Internet, connections between devices on the

Internet often cross state and international borders, even when the

devices communicating with each other are in the same state.

55.     Based on my training, experience, and research, I know that the SUBJECT

DEVICES have capabilities that allow it to serve as list a wireless telephone, digital

camera, portable media player, GPS navigation device, and PDA.  The SUBJECT

DEVICES also can access the Internet, and can send and received emails.  In my training

and experience, examining data stored on devices of this type can uncover, among

other things, evidence that reveals or suggests who possessed or used the device.

56.     Based on the investigation detailed above, it is believed that ARNAUT uses his cellular telephones, to commit the drug trafficking offenses of possession with intent to distribute controlled substances and conspiracy to commit controlled substances (SUBJECT OFFENSES), and that the cell phones (SUBJECT DEVICES) which were located on his person when arrested were used to facilitate these crimes and may contain evidence of such crimes.

57.     Furthermore, based on my training and experience, and my participation in other controlled substance investigations, I know that it is common for drug dealers to use cellular telephones to facilitate their illegal distribution operations.  I also know that drug trafficking is an illicit business and an ongoing process requiring the development, use, and protection of a communication network to facilitate daily drug distribution.  Drug dealers use various methods to thwart law enforcement detection, including frequently changing cellular phones and vehicles, using various aliases, and using coded communications.  I also know that drug traffickers commonly maintain addresses or telephone numbers in cellular telephones that reflect names, addresses, and/or telephone numbers for their associates in the drug trafficking organization, even if that information may be in code.  These types of records are sometimes maintained in computers, cellular telephones or other electronic data storage devices.  Records and electronic devices of this sort are also frequently found on the persons of drug traffickers or in their residences, motor vehicles, and other locations controlled by them.

58.     Drug traffickers also frequently take, or cause to be taken, photographs and/or videos of themselves, their associates, or their property.  Records in the form of photographs and/or videos often provide valuable evidence of conspiratorial relationships and are increasingly found stored on items capable of storing electronic data, like cellular telephones.

59.     In addition, drug traffickers frequently maintain books, records, receipts, notes, ledgers, airline tickets, money orders, and other papers relating to the transportation, ordering, sale, and distribution of controlled substances.  Records of this type are kept in locations where traffickers have ready access to them, including on smart telephones.  Drug traffickers also normally maintain these items and records for long periods of time regardless of whether their value to the dealer has diminished. Oftentimes, this type of evidence is generated, maintained, and then forgotten about. Thus, documents that one would think a prudent person would destroy because of their incriminatory nature are still possessed months or even years after the documents came into the possession of the drug dealer.  Oftentimes, these individuals do not even realize the incriminatory nature of the documents they keep.  Documentary evidence dating back years is sometimes found in locations controlled by traffickers.

60.     Furthermore, based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that the following electronic evidence, inter alia, is often retrievable from digital devices:

a.   Forensic methods may uncover electronic files or remnants of such files months or even years after the files have been downloaded, deleted, or viewed via the Internet.  Normally, when a person deletes a file on a computer, the data contained in the file does not disappear; rather, the data remain on the hard drive until overwritten by new data, which may only occur after a long period of time.  Similarly, files viewed on the Internet are often automatically downloaded into a temporary directory or cache that are only overwritten as they are replaced with more recently downloaded or viewed content and may also be recoverable months or years later.

b.   Digital devices often contain electronic evidence related to a crime, the device's user, or the existence of evidence in other locations, such as, how the device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents, programs, applications, and materials on the device.  That evidence is often stored in logs and other artifacts that are not kept in places where the user stores files, and in places where the user may be unaware of them.  For example, recoverable data can include evidence of deleted or edited files; recently used tasks and processes; online nicknames and passwords in the form of configuration data stored by browser, e-mail,

31

and chat programs; attachment of other devices; times the device was in

use; and file creation dates and sequence.

c.   The absence of data on a digital device may be evidence of how the device

was used, what it was used for, and who used it.  For example, showing

the absence of certain software on a device may be necessary to rebut a

claim that the device was being controlled remotely by such software.

d.   Digital device users can also attempt to conceal data by using encryption,

steganography, or by using misleading filenames and extensions.  Digital

devices may also contain "booby traps" that destroy or alter data if certain

procedures are not scrupulously followed.  Law enforcement

continuously develops and acquires new methods of decryption, even for

devices or data that cannot currently be decrypted.

61.   Based on my training, experience, and information from those involved in

the forensic examination of digital devices, I know that it is not always possible to

search devices for data during execution of a search warrant for a number of reasons,

including the following:

a.   Digital data are particularly vulnerable to inadvertent or intentional

modification or destruction.  Thus, often a controlled environment with

specially trained personnel may be necessary to maintain the integrity of

and to conduct a complete and accurate analysis of data on digital devices,

32

which may take substantial time, particularly as to the categories of
electronic evidence referenced above.

b.  Also, there are now so many types of digital devices and programs that it
is difficult to bring to a search site all of the specialized manuals,
equipment, and personnel that may be required.

c.  Digital devices capable of storing multiple gigabytes are now
commonplace.  As an example of the amount of data this equates to, one
gigabyte can store close to 19,000 average file size (300kb) Word
documents, or 614 photos with an average size of 1.5MB.

### Procedures for Searching (Electronically Stored Information) ESI

62.     Law enforcement personnel (including, in addition to law enforcement
officers and agents, and depending on the nature of the ESI and the status of the
investigation and related proceedings, attorneys for the government, attorney support
staff, agency personnel assisting the government in this investigation, and outside
technical experts under government control) will review the SUBJECT DEVICES found
on the person of ARNAUT, for information responsive to the warrant, as described in
Attachments B1 and B2.

63.     In conducting this review, law enforcement may use various techniques to
determine which files or other ESI contain evidence or fruits of the SUBJECT
OFFENSES.  Such techniques may include, for example:

a.  Surveying directories or folders and the individual files they contain (analogous to looking at the outside of a file cabinet for the markings it contains and opening a drawer believed to contain pertinent files);

b.  Conducting a file-by-file review by "opening" or reading the first few "pages" of such files in order to determine their precise contents (analogous to performing a cursory examination of each document in a file cabinet to determine its relevance);

c.  "Scanning" storage areas to discover and possibly recover recently deleted data; scanning storage areas for deliberately hidden files; and

d.  Performing electronic keyword searches through all electronic storage areas to determine the existence and location of search terms related to the subject matter of the investigation. (Keyword searches alone are typically inadequate to detect all information subject to seizure. For one thing, keyword searches work only for text data, yet many types of files, such as images and videos, do not store data as searchable text. Moreover, even as to text data, there may be information properly subject to seizure but that is not captured by a keyword search because the information does not contain the keywords being searched.)

64.  Law enforcement personnel will make reasonable efforts to restrict their search to data falling within the categories of evidence specified in the warrant.

Depending on the circumstances, however, law enforcement may need to conduct a complete review of all the ESI to locate all data responsive to the warrant.

### *Accessing the ESI*

65.     The SUBJECT DEVICES found on the person of ARNAUT may include biometric unlock technology.

66.     The search warrant applied for in this case requests authorization to use the biometric unlock features of a device, based on the following, which I know from my training, experience, and review of publicly available materials:

a.  Users may enable a biometric unlock function on some digital devices.  To use this function, a user generally displays a physical feature, such as a fingerprint, face, or eye, and the device will automatically unlock if that physical feature matches one the user has stored on the device.  To unlock a device enabled with a fingerprint unlock function, a user places one or more of the user's fingers on a device's fingerprint scanner for approximately one second.  To unlock a device enabled with a facial, retina, or iris recognition function, the user holds the device in front of the user's face with the user's eyes open for approximately one second.

b.  In some circumstances, a biometric unlock function will not unlock a device even if enabled, such as when a device has been restarted or inactive, has not been unlocked for a certain period of time (often 48 hours or less), or after a certain number of unsuccessful unlock attempts.  Thus,

the opportunity to use a biometric unlock function even on an enabled device may exist for only a short time.  I do not know the passcodes of the device(s) likely to be found in the search.

67.     Thus, the warrant I am applying for would permit law enforcement personnel to, with respect to any device that appears to have a biometric sensor and falls within the scope of the warrant: (1) depress the USER's thumb- and/or fingers onto the fingerprint sensor of the device (only when the device has such a sensor), and direct which specific finger(s) and/or thumb(s) shall be depressed; and (2) hold the device in front of the USER's face with his or her eyes open to activate the facial-, iris-, or retina-recognition feature, in order to gain access to the contents of any such device.

### Return of the SUBJECT DEVICES

68.     If the Government determines that any electronic devices are no longer necessary to retrieve and preserve the data on the devices, and that the electronic devices are not subject to seizure pursuant to Federal Rule of Criminal Procedure 41(c), the Government will return the electronic devices upon request and in no event later than 60 days from the date of seizure unless additional time is granted by court order. Data that is encrypted or unreadable will not be returned unless law enforcement personnel have determined that the data is not (i) an instrumentality of the offense, (ii) a fruit of the criminal activity, (iii) contraband, (iv) otherwise unlawfully possessed, or (v) evidence of the SUBJECT OFFENSES.

*Conclusion*

69.     Based on the facts described above, I believe that the investigation has revealed that ARNAUT engages in illegal narcotics trafficking, and that evidence of these drug trafficking activities will be in the SUBJECT DEVICES.  I therefore respectfully request that this Court issue a search warrant authorizing the search of the SUBJECT DEVICE, as described in Attachment A, for the electronically stored evidence described in Attachment B.

70.     I, Caolan Scott, having signed this Affidavit under oath as to all assertions and allegations contained herein, state that its contents are true and correct to the best of my knowledge, information, and belief.

Respectfully submitted

Caolan R. Scott
Special Agent

_____
Federal Bureau of Investigations

Attested to by the applicant in accordance with the requirements of Fed.
R. Crim. P.  4.1 by _____.
                          *(specify reliable electronic means)*

_____            _____
         *Date*                                              *Judge's signature*

_____            _____
      *City and State*                                *Printed name and title*